Elliot Gale (Bar #1119904)
egale@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiffs
Sean and Tamina Burke

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SEAN AND TAMINA BURKE, <br><br> Plaintiffs, <br><br> v. <br><br> Experian Information Solutions, Inc.; Equifax, Information Services, LLC; TransUnion, LLC; and JPMorgan Chase Bank, N.A. <br><br> Defendants. | CASE NO. 2:20-cv-01531 <br><br> COMPLAINT FOR DAMAGES: <br><br> 1. Violation of Fair Credit Reporting Act |

COMES NOW Plaintiffs Sean and Tamina Burke, individuals, based on information and belief, to allege as follows:

## **INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)).

2. Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiffs' mortgage accounts with JPMorgan Chase Bank, N.A. (hereinafter "Chase").
3. Here, Chases continue to report inaccurate and incomplete information regarding Plaintiffs' mortgage account.
4. Defendant Chase is reporting that Plaintiffs' mortgage is included in an active chapter 13, despite Plaintiffs no longer being in a chapter 13 bankruptcy proceeding.
5. To the extent the Chase mortgage account has been transferred, Chase has failed to follow industry standards for transferring an account, resulting in the situation where the same account appears twice on Plaintiffs' credit report in contradictory fashion – one adverse and one positive.
6. Such reporting is misleading and adversely impacts Plaintiffs' credit worthiness.
7. Plaintiffs' credit has been damaged as a result of the inaccurate and misleading reporting and they have been unable to qualify for loans or a mortgage as a result of their credit score due to the reporting of Chase.
8. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.
9. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

10. Plaintiffs re-allege and incorporate herein by reference the allegations in each and every paragraph above, fully set forth herein.
11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681
12. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

13. Plaintiffs allege that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
14. Plaintiffs allege that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.
15. Plaintiffs allege that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiffs' attempt to improve their FICO Score.
16. In the alternative Plaintiffs allege that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

17. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.
18. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.
19. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.
20. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.
21. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

22. There are 28 FICO Scores that are commonly used by lenders.
23. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).
24. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.
25. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
26. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.
27. Each of the five factors is weighted differently by FICO.
28. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
29. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.
30. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.
31. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.
32. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

**e-OSCAR**

33. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.
34. When a consumer sends a dispute letter to a CRA the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.
35. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**Metro 2**

36. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.
37. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.
38. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
39. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
40. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.

e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

   f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

   g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

41. The CDIA's Metro 2 is accepted by all CRAs.
42. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
43. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
44. The three main credit bureaus helped draft the CRRG.
45. The CRRG is not readily available to the public. It can be purchased online for $229.45.
46. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
47. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
49. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.
50. All three major CRAs are members of the CDIA

51. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

### Consumer Information Indicator

52. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.

53. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

54. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

55. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

56. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

57. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

58. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. There is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

59. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

60. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

61. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

62. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a mortgage).

63. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
64. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiffs, included an account in a bankruptcy proceeding despite not having done so.
65. It also may result (as is the case here) where it appears an account continues to be in an *active* bankruptcy when in fact no bankruptcy case is pending.
66. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.
67. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Transferring Accounts**

68. Its common practice for lenders to transfer accounts to other lenders and or service providers.
69. While the CRRG does give guidance on how to properly report transferred accounts the CRRG does not address how a data furnisher should update the consumer information indicator upon transfer.
70. The CRRG does, however, state that the "PREFERED OPTION," if account history can be verified, results in a single trade line being reported upon transfer.
71. Specifically, that upon transfer the new lender updates the account number and retains all previous history on the account.
72. Here, Chase's failure to follow the preferred option has resulted in Plaintiffs having two trade lines representing the same debt/account but reported in dramatically different fashions leading to an inaccurate and misleading picture regarding Plaintiffs' account.
73. Specifically, Chase's reporting makes it appear that: 1) Plaintiffs remain in an active bankruptcy, and 2) the mortgage accounts non-dischargeability has not been adjudicated; both are facially inaccurate and both lower Plaintiffs' creditworthiness.

**Plaintiffs' Dispute**

74. On June 29, 2020 Plaintiffs each ordered a three bureau credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiffs' creditors after their chapter 13 bankruptcy was completed.

75. Plaintiffs noticed various delinquent and adverse trade lines on their June 29, 2020 credit report where Chase was not reporting complete information regarding their mortgages, including reporting that the account was subject to a wage earner plan and included and/or discharged in bankruptcy.

76. In addition, the report showed an incomplete payment history making it appear ambiguous whether or not payments were being made.

77. In response, Plaintiffs disputed the Chase trade lines via certified mail with Experian, Equifax, and TransUnion.

78. Mr. Burke sent his dispute on July 8, 2020 and Mrs. Burke sent her dispute on August 4, 2020.

79. Plaintiffs' dispute letters specifically put Defendant Chase on notice that the account should not be listed as discharged, included in bankruptcy, and making payments under a wage earner plan as the account was not discharged and not currently subject to an active bankruptcy case.

80. The dispute letters also informed Chase that the payment history was incorrect and that the mortgage account was not charged off.

81. Plaintiffs are informed and believes that each CRA received Plaintiffs' dispute letter and in response sent Plaintiffs' dispute to each DF via an ACDV through e-OSCAR.

82. After the statutory time period had elapsed for Plaintiffs to receive a reinvestigation report from the credit Bureaus, Plaintiffs ordered a second credit report for the sole purpose to ensure Plaintiffs accounts had in fact been updated. Mr. Burke ordered his report on August 12, 2020 and Mrs. Burke ordered her report on September 10, 2020.

**Inaccuracy – Chase**

83. Plaintiffs were frustrated to see that Defendant Chase did not properly update the account.

84. Chase was still reporting the account as included and or discharged in bankruptcy and making payments under a wage earner plan despite the account not being included or discharged in Plaintiffs' chapter 13 bankruptcy.
85. Chase's reporting is inaccurate because Plaintiffs did not include or seek to discharge their mortgage with Chase in their bankruptcy filing.
86. Chase's reporting is entirely incomplete, misleading and technically inaccurate.
87. The reporting is incomplete because the report lacks any updates on the account.
88. Chase should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed their chapter 13 plan, or at least removed the bankruptcy notations.
89. As it stands it appears that Chase continues to report the CII "D" making it appear that Plaintiffs continue to be in an active bankruptcy and that the account may or may not be subject to Plaintiffs' discharge given that such a discharge has been completed.
90. To be clear, it is IMPOSSIBLE for accuracy purposes for Chase to accurately report a CII "D" after completion of Plaintiffs' Chapter 13 bankruptcy plan.
91. The CII "D" should only be reported during an active bankruptcy. Plaintiffs are no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy.
92. To the extent Chase transferred the account, Chase failed to take action to ensure that only one tradeline appeared and failed to list which lender assumed control of the account.
93. As a result, Chase should know that the CII "D" cannot possibly be accurate.
94. Such reporting makes Plaintiffs appear less credit worthy.

**Willfulness**

95. This was not a negligent act by Defendant Chase but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore his credit.
96. Chase's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs sought to discharge and include

their mortgage in their chapter 13 bankruptcy proceeding and that Plaintiffs remain in an active Chapter 13.

97. Chase knows that its reporting must be accurate and complete.

98. To the extent Chase may have transferred the account, Chase should have updated the CII to a Q upon notice of the dispute and notated who assumed control over the account.

99. Chase did neither, resulting in Plaintiffs' mortgage appearing as though it is still included in an active chapter 13/discharged in bankruptcy.

100. Chase, with knowledge of Plaintiffs' dispute, chose NOT to update Plaintiffs' credit report and instead still reported that the account was subject to a chapter 13 bankruptcy and otherwise may or may not be discharged.

**Damages**

101. As a result of the incorrect reporting, Plaintiffs have suffered economic loss, diminished credit, and emotional harm.

102. Plaintiffs have been unable to obtain favorable interest rates and suffers from a diminished credit score given the inaccurate reporting by Nationstar/Seterus and Chase.

103. Seterus and Chase's inaccurate reporting negatively impacted Plaintiffs' ability to obtain a mortgage or refinance their property.

104. Plaintiffs are also fearful that any additional credit applications will continue to harm their credit score and they will continue to receive unfavorable interest rates until the Seterus and Chase tradelines are properly updated.

105. The actions of Experian, Equifax, TransUnion, and Chase as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

<u>**FIRST CAUSE OF ACTION**</u>
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants)

**Experian Information Solutions, Inc. and Equifax Information Services, LLC, TransUnion LLC – Failure to Assure Credit Reporting Accuracy.**

106. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

107. Experian, TransUnion and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' credit reports and credit files it published and maintained concerning Plaintiff.

108. Had Experian, TransUnion and Equifax maintained reasonable procedures to assure maximum accuracy Experian, TransUnion and Equifax would never have allowed Defendant Chase to report the account as described herein.

109. Chase appears to be reporting a "CII" that refers to an active bankruptcy.

110. Experian, TransUnion, and Equifax report that Plaintiffs have completed her bankruptcy and therefore Experian, TransUnion, and Equifax should know that Chase's reporting cannot possibly be accurate.

111. Even assuming the CRAs are not sophisticated enough to address this obvious contradiction, Plaintiffs disputed the accounts and the CRAs still did not fix the issue.

112. Instead, the account remains unchanged.

113. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

114. The violations described herein by Experian, TransUnion, and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

115. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

116. Such a finding should shock the conscience.

117. When those errors are disputed Equifax, TransUnion, and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

118. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

119. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian, TransUnion, and Equifax receive little to know training concerning how to accurately report consumer debt.

120. Instead these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)

121. Experian, TransUnion, and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

122. Experian, TransUnion, and Equifax have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

123. Experian, TransUnion, and Equifax also allowed Chase to report its accounts with inaccurate information despite specifically being told in the dispute letter why the information Chase was reporting was incorrect.

124. All three CRAs are members of the consumer data industry association

125. The consumer data industry association has specifically briefed and AGREED with Plaintiffs that the reporting of the Chase account in the present matter is inaccurate. See **Brief for the Consumer Data Industry Association as Amicus Curia in Support of Defendents-Appellees** in *Alan R. Riekki v. Bayview Financial Loan Servicing*, et al., Case No 16-16438 in The United States Court of Appeals For the Ninth Circuit.

126. Despite the CRAs having actual knowledge of Plaintiffs' bankruptcy, Chase reporting the accounts included in an ongoing bankruptcy, and the bankruptcy actually being closed,

Experian, TransUnion, and Equifax continue to allow Chase to report the accounts included and discharged in bankruptcy.

127. Not only are Experian, TransUnion, and Equifax allowing Chase to report in a manner that they know is factually impossible (an account cannot be included in an on-going bankruptcy if the bankruptcy has been closed) but in a manner the CDIA has specifically briefed as inaccurate.

128. As a result, Experian, TransUnion, and Equifax are allowing Chase to report in a manner they know is factually and legally inaccurate.

129. Consequently, Defendants Experian, TransUnion, and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

130. In the alternative, Experian, TransUnion, and Equifax were at least negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

131. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian, TransUnion, and Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against Defendants)

**Chase – Failure to Reinvestigate.**

132. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

133. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

134. Defendant Chase violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

14

135. The CRAs provided notice to Chase that Plaintiff was disputing the inaccurate and misleading information but Chase failed to conduct a reasonable investigation of the information as required by the FCRA.
136. Based on Plaintiffs' dispute, Chase should have known that its reporting was incomplete as Plaintiffs' dispute letter highlighted the problems with the tradelines.
137. The most basic investigation would simply involve reading Plaintiffs' dispute.
138. Plaintiffs allege Chase did not review well established industry standards for credit reporting.
139. If Chase had reviewed such standards Chase would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.
140. Moreover, had Chase done any investigation whatsoever it would have uncovered that its reporting showed an active bankruptcy when in fact Plaintiffs were not actually in bankruptcy at all.
141. The lack of investigation is unreasonable.
142. Plaintiffs further allege that Chase have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian, TransUnion, and Equifax – Failure to Reinvestigate Disputed Information.**

143. Plaintiffs re-allege and incorporate herein the allegations in each and every paragraph above as though fully set forth herein.
144. After Plaintiffs disputed the accounts mentioned above, Experian, TransUnion, and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.
145. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

146. Experian, TransUnion, and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiffs explicitly explained that the Chase accounts were not included or discharged in their bankruptcy and provided verification that ongoing payments were being made on their account.

147. Plaintiffs allege that Experian, TransUnion, and Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

148. Experian, TransUnion, and Equifax are not passive entities bound to report whatever information a DF provides.

149. Given the aforementioned, Plaintiffs allege that Experian, TransUnion, and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

150. Experian, TransUnion, and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

151. Experian, TransUnion, and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiffs' dispute letters.

152. Experian, TransUnion, and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

153. Experian, TransUnion, and Equifax intentionally, willfully or with reckless disregard for Plaintiffs' accuracy did no investigation whatsoever given that Experian, TransUnion, and Equifax's general policy is to simply parrot whatever information a data furnisher sends.

154. Such policy and procedure inherently leads to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

**THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants)

**Experian, TransUnion, and Equifax – Failure to Review and Consider All Relevant Information.**

155. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

156. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiffs.

157. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

158. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

159. In the alternative Experian, TransUnion, and Equifax were negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

160. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax, TransUnion, and Experian in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants)

**Experian, TransUnion, and Equifax– Failure to Delete Disputed and Inaccurate Information.**

161. Plaintiffs re-allege and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

162. Experian, TransUnion, and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' credit file or modify the item of information upon a lawful reinvestigation.

163. As a result of Experian, TransUnion, and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

164. The violations by Experian, TransUnion, and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

165. In the alternative, Experian, TransUnion, and Equifax were negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

166. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

Wherefore, Plaintiffs pray for judgment as hereinafter set forth.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;
5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: October 2, 2020 /s/ *Elliot Gale*

Elliot Gale
Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of this matter by jury.

Dated: October 2, 2020

**Gale, Angelo, Johnson, & Pruett, P.C.**
*/s/ Elliot Gale*
Elliot Gale
Attorneys for Plaintiffs